813 So.2d 377 (2002)
STATE of Louisiana
v.
David Henry BOWIE.
No. 2000-KA-3344.
Supreme Court of Louisiana.
April 3, 2002.
*380 G. Paul Marx, Esq., Lafayette, for Appellant.
Richard P. Ieyoub, Atty. Gen., Douglas P. Moreau, Dist. Atty., Creighton B. Abadie, Esq., Baton Rouge, Tracey E. Barbara, Esq., Beau J. Brock, Esq., Richard C. Nevils, Esq., Baton Rouge, for Respondent.
TRAYLOR, J.
On March 3, 1996, an East Baton Rouge grand jury indited David Henry Bowie for the first degree murder of John Smith.[1] After a ten-day bifurcated trial ending in March of 1999, a petit jury found the defendant guilty as charged and unanimously recommended imposition of the death penalty, after finding several aggravating circumstances: (1) that the killing occurred while the defendant was engaged in the perpetration or attempted perpetration of an armed robbery or second degree kidnapping; (2) that he knowingly created a risk of death to more than one person; (3) that the crime was committed in an especially heinous, atrocious or cruel manner; and (4) that the victim was older than sixty-five. La.C.Cr.P.art. 905.4(A)(1), (4), (7), (10).
On direct appeal to this Court under La. Const. Art. 5, § 5(D), defendant appeals his conviction and death sentence. For the reasons set forth below, we affirm the defendant's conviction for first degree murder and the sentence to death.

FACTS
John Smith and Leslie Domengeaux spent the evening of January 16, 1996 riding in Smith's Nissan Maxima and drinking. Domengeaux testified, and other witnesses agreed, that the victim liked women, alcohol and gambling. On the night of January 16, Smith drank gin and Thunderbird wine. Domengeaux joined in the drinking and also smoked crack cocaine, to which she was addicted, and which was furnished by Smith on January 16 and 17 in exchange for sex. Back at Smith's home, early on the morning of January 17, Smith and Domengeaux had intercourse. Smith continued to drink while Domengeaux consumed the last of the cocaine. Afterwards, Domengeaux left in Smith's Nissan to buy more crack. Her search took her to a fast-food restaurant, where she spotted the defendant in his mother's Lincoln Town Car. Domengeaux knew that defendant was a source for crack cocaine, and had a large supply of rock cocaine that morning.[2]
*381 Domengeaux knew the defendant from the neighborhood. The defendant and the victim also were acquainted. Domengeaux and the defendant smoked cocaine in the Lincoln, then went to Smith's home where the two men drank and shot dice. Also present in the house at this point was Kathy Armstead Fort. Fort helped Smith in his small fish-selling business and was often in Smith's home. Like Domengeaux, Fort was also a cocaine addict. While the men gambled, the women went to the kitchen to smoke crack furnished by the defendant.
At some point that morning, the defendant lost all his money to Smith and he telephoned friends to borrow funds. The women were sent to pick up Michael Owens and Charlie Sterling, men known to both Domengeaux and Fort, and friends of the defendant. The defendant and his two friends, Owens and Sterling, lived in Scotlandville's Rosenwald Apartment complex. Once at Smith's house, the dice game resumed with Smith, defendant and Sterling playing. Owens only watched but joined in the beer-drinking and general smoking of "blunts," i.e., cigars with marijuana cores. The women drank beer and smoked crack, while Smith drank Seagram's VO and vodka.
The defendant lost again, as did Sterling. At some point, defendant and Domengeaux retreated to the spare bedroom in Smith's small home, where they had sex and smoked crack. Later the defendant got up, donned a pair of boxer shorts and told Domengeaux he would be back. The next thing Domengeaux heard was defendant telling Smith that he wanted his money back. Apparently, defendant had walked to the front and asked if Sterling had any more money. Defendant said something about knocking peoples' heads off, which Sterling shrugged off because he thought his friend was simply upset over losing at dice. Suddenly the defendant had a gun in his hand and was telling everyone to cooperate. Owens testified that he did not hear the defendant threaten to harm or kill anyone. However, he watched as the defendant, dressed in boxer shorts and holding a gun, took money from the top front pocket of Smith's jump suit. Fort saw the defendant gather the money, and recognized the weapon he held as Smith's own .38 revolver. As ordered, Owens, Sterling and Fort crowded into the spare bedroom with Domengeaux. Defendant came to the door, handed the gun to Sterling and told him to watch them. Smith and the defendant were alone for an unknown period of time. No one heard anything untoward. Subsequently, the defendant called Sterling from the bedroom, telling him to leave the gun with Owens. Sterling had already told the women he would not harm them, and when Owens got the weapon he tossed it on the bed.
The defendant, Sterling and Smith went into Smith's bedroom. From the next room Kathy Fort heard the defendant tell Sterling to hit Smith. She heard the sound of an impact, followed by gasping and gagging. She heard no struggle. The defendant kept telling Smith to open the safe in his closet. When he gave Smith two minutes to open it, Fort and Domengeaux offered to help get the combination. Smith continued to refuse, saying that he was not worried about the gun or the guys and that they would not get his money unless he was dead. The women returned to the spare bedroom.
According to Sterling, when he first arrived in Smith's bedroom, Smith was asking the defendant why he was doing this. Sterling could not recall the defendant's reply, but he did recall that the defendant *382 still had the gun. For this reason, when defendant ordered him to hit the victim with his "best shot," Sterling complied. Sterling hit the victim three times, "not really trying," as Smith was "full of beer and blunts" and too drunk to struggle. The defendant ordered Sterling to get some shoelaces, but Sterling was "not sure" who retrieved the laces. Sterling watched the defendant loop the shoelaces around Smith's neck and choke him. The victim urinated, and had blood bubbles popping out of his nose. Pressed on the whereabouts of the revolver when the defendant had his hands around the victim's neck, Sterling testified variously that the defendant or Owens had the weapon, and then that he could not recall. Asked why he did not try to stop the defendant, Sterling replied, "`[c]ause I ain't no Superman and I ain't the type ....for to go playing no hero or nothing like that, that's just not me."
Unsatisfied with the shoelaces, the defendant grabbed the victim and propelled him from his bedroom into the short hallway. The defendant then kicked open the door of the spare bedroom, pushing and dragging the unresisting Smith with him. Domengeaux saw the defendant grab tissue from the adjacent bathroom and shove it into the victim's nose and mouth. Sterling also witnessed this, as well as saw the defendant put a towel in Smith's mouth and place a rag over his face. The defendant then called for an electric clothing iron, which stood on a table in the spare bedroom. Owens saw the defendant pick up the iron, and Fort watched the defendant loop its cord twice around the victim's neck, then pull and tie it tightly.
Once convinced that the victim was dead, the defendant ordered Sterling to get a garbage can, and told everyone to cleanup. They emptied ashtrays and other (unspecified) "stuff" into the can. The can went with them when they left the house, right after the defendant ripped the phone from the wall.
Owens, Sterling, Domengeaux, Fort and the defendant got into the victim's Nissan Maxima. With Domengeaux at the wheel and the defendant directing, they drove to the Shad-Dran Motel. It is unclear who got the room. Owens testified that Kathy Fort and the defendant went to the motel office, while Fort testified that defendant was "always right here with me," and that she could not recall who got the room. In any event, all five gathered in the motel room where the defendant told Owens, Sterling, and Domengeaux to contact his mother for a ride. They left, made the call without disclosing any information about the killing, and returned. The defendant instructed Owens and Sterling to get rid of the Nissan. He voiced no threats, but said that the ladies would remain with him. Owens and Sterling left in the victim's Nissan. They abandoned the vehicle near Mall City and caught a ride back to Scotlandville. Owens did not remember what happened to the victim's .38 revolver while Sterling thought that the defendant had left it under a seat in the Nissan. He denied removing the revolver from the car.
Meanwhile, the defendant's mother arrived at the Shad Dran Motel. She drove her son, Fort and Domengeaux to the Starring Road Motel, then left. Domengeaux did not see the defendant with cash but assumed that he had money, as he paid for the rooms. At the Starring, Domengeaux, Fort and the defendant smoked crack. At a point unclear to Domengeaux, the defendant's mother was called again. She picked them up. At her son's direction, the defendant's mother took them to the Elm Grove Motel.
That night, many hours after Owens and Sterling abandoned the victim's Nissan, Owens received a visit at his home *383 from the defendant's mother. The defendant was asking for him, Mrs. Bowie said. Owens agreed to accompany her to the Elm Grove Motel because the defendant "was a friend," because Owens "wanted to see what kind of condition he was in" and because he wanted to know his friend's intentions regarding Fort and Domengeaux. At the Elm Grove the defendant told Owens that "he had to get rid of the [women,]" and that he "had to do something with them...." Everyone got into Mrs. Bowie's Lincoln. Mrs. Bowie drove. The defendant sat in the front while Owens, Domengeaux and Fort sat in the back. When Mrs. Bowie stopped to drop off food to a relative, the defendant ordered Owens to take the wheel and off they went. After stopping at a liquor store, where the defendant went in alone to buy beer, he directed Owens to a location near Gibbens and Gore Roads. There the defendant pointed a gun at Domengeaux, then Fort. Owens yelled for him not to shoot, but the defendant fired multiple times at Fort. This weapon was a small .25 semi-automatic, later identified by a slug removed from the seat upholstery, not the same weapon the defendant had in the victim's home. Fort stated that she first saw the .25 at the Elm Grove Motel.
Owens braked to a halt. He, Fort and Domengeaux jumped from the Lincoln and began running. The defendant shouted to Owens to "catch Leslie [Domengeaux,]" but Owens told her to keep running. The defendant gave up chasing Fort, got back in the Lincoln and drove off. Owens and Domengeaux made their way to a police sub-station where they reported the events and later gave taped statements to Baton Rouge City Police detectives. Kathy Fort was taken to a hospital for treatment of four gunshot wounds. There she gave a verbal statement, naming the defendant as the man who shot her and as the person who strangled John Smith earlier that day. The shooting occurred at approximately 10:00 p.m. Smith's body was found shortly thereafter.
On January 20, 1996, the defendant surrendered.
Neither of the weapons was found, nor was the garbage can removed from Smith's home ever recovered. The single piece of physical evidence linking the defendant to the crime scene or to the victim's vehicle was a match to DNA deposited on a cigarette butt recovered from the floor of the victim's bedroom near the safe. A state expert testified that two individuals shared the cigarette but that the defendant was the major DNA contributor.

DISCUSSION
Defendant filed eighteen (18) assignments of error, contending that his conviction and sentence should be reversed. While we will consider all of the assignments of error urged by defendant, only four (4) of the assignments merit discussion in this published opinion, the others will be discussed in an unpublished appendix.[3]

Pre-Trial

Assignments of Error Nos. Four and Fourteen
The defendant complains of two Brady violations. First, defendant contends that the state failed to disclose plea bargains and other inducements to their witnesses, despite discovery requests. Second, defendant maintains that the district court erred in refusing to order the state's disclosure *384 of rap sheets of the state's principal witnesses.
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the prosecution of evidence favorable to the accused, when requested, violates the defendant's due process rights, if the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Knapper, 579 So.2d 956, 959 (La.1991). A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Willie, 410 So.2d 1019, 1030 (La.1982).
For purposes of Brady's due process rule, a reviewing court, in determining materiality of evidence, must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing Bagley, 473 U.S. at 678, 105 S.Ct. 3375). Thus, the reviewing court does not put the evidence to an outcome-determinative test in which the court weighs the probabilities that the defendant would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the "evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, 115 S.Ct. 1555 (quoting Bagley, 473 U.S. at 678).
Despite the state's contention that it has no duty to turn over information concerning plea bargains or other inducements to its witnesses, it is well established that the state does have an affirmative due process obligation to divulge information which is favorable to an accused and material on the issues of guilt or punishment or the credibility of a witness whose reliability may be determinative of guilt or innocence or affect the outcome of the trial. Kyles, 514 U.S. at 434, 115 S.Ct. 1555; United States v. Bagley, 473 U.S. at 667, 105 S.Ct. 3375 Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Knapper, 579 So.2d 956, 959 (La.1991); State v. Rosiere, 488 So.2d 965, 970-971 (La.1986). There is no category of information which is per se undiscoverable against an accused's right to Brady information.[4] In the instant case, *385 the crux of state's case against the defendant rested on the credibility of the four witnesses. Clearly, the witnesses' credibility had a significant impact on the outcome of the trial.
A particular type of impeachment evidence which may rise to the level of materiality under Brady is that used to show bias, interest or corruption. Thus, any plea bargains or other inducements should be made available to the defense prior to trial. A defendant's right to demonstrate facts and circumstances which might influence the witness's perceptions or color his testimony, thereby lessening the weight the fact-finder might accord his testimony, is guaranteed in both state and federal criminal proceedings and is an important function of the right to confront and cross-examine. U.S. Sixth Amendment; Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Giglio; La. Const. Art. I, § 16; La. C.E.art. 607(C),(D) (authorizing admission of intrinsic and extrinsic evidence to show bias, interest or corruption); State v. Clark, 492 So.2d 862, 869 (La.1986); State v. Trahan, 475 So.2d 1060, 1062-1063 (La.1985); State v. Nash, 475 So.2d 752, 754-755 (La.1985); State v. Rankin, 465 So.2d 679, 681 (La.1985); State v. Sweeney, 443 So.2d 522, 529 (La. 1983); State v. Brady, 381 So.2d 819, 821-822 (La.1980). See also the former La. R.S. 15:492 (repealed; see La.C.E.art. 607).
The possibility that the state may have some "leverage over a witness due to that witness' pending criminal charges is recognized as a valid area of cross-examination." Rankin, 465 So.2d at 681. It is well-settled that a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish bias or interest." State v. Vale, 95-1230, 95-0577, (La.1/26/96), 666 So.2d 1070, 1072, quoting Brady, 381 So.2d at 822. See State v. Daniel, 378 So.2d 1361, 1367-1368 (La.1979); State v. Bailey, 367 So.2d 368 (La.1979); State v. Franks, 363 So.2d 518, 520 (La.1978); State v. Robinson, 337 So.2d 1168 (La.1976). A similar rule applies in federal courts. Davis v. Alaska; Giglio. Moreover, a "witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding the conduct." Vale, 666 So.2d at 1072, citing Nash. Therefore, if the state entered into a deal or arrangement with an eye-witness, and if the revelation would have lessened that witness's credibility and "in any reasonable likelihood [could] have affected the judgment of the jury," the defendant is entitled to reversal and a new trial. Giglio, 405 U.S. at 153, 92 S.Ct. at 766; see Bagley, 473 U.S. at 676, 105 S.Ct. at 3380.
The state denies the existence of deals or inducements and insists that Maryland v. Brady requires it to disclose "only evidence that is both favorable to the defendant and material to either guilt or to punishment." The state maintains that it did not charge any of the witnesses with a crime relating to the events because the testimony of the witnesses did not support a finding of criminal culpability. In support *386 of this position, the state introduced the testimony of Detective Michael Verrett who testified generally that investigators believed the accounts of Owens, Sterling, Fort and Domengeaux and credited their claims of being frightened and fearful of retribution. He further stated that investigators viewed their accounts as not wildly divergent, noting that all indicated defendant acted alone both in the murder of Smith and the shooting of Fort, that all were under the control of an armed perpetrator and, lastly, that none shared in the robbery proceeds. There was no objection to this (opinion) testimony. In addition, the state points out that the defense objected when it sought to question one eyewitness about a possible deal.
Although we find that a criminal defendant is entitled to know whether the state has entered into any plea bargains or provided any inducements, we determine, from the record in this case, that the defense fails to shows the existence of any deals or inducements, or any basis for impending charges. As a result, the defense does not demonstrate prejudice from non-disclosure.
Next, we will consider defendant's contention that he was denied rap sheets and NCIC Reports as well as any and all favorable evidence.
This Court has long enforced a defendant's right to production of arrest and conviction records of state witnesses for impeachment purposes which satisfy Brady's materiality standard. State v. Robinson, 96-0343, 96-0353 (La.9/20/96), 679 So.2d 411 (two cases)(capital defendants won ruling ordering disclosure of rap sheets of principal state witnesses, as well as "material" criminal history data; a majority on the court of appeal panel found that the state had no obligation to seek out criminal records not shown to exist; this Court granted a defense application, vacated the judgment of the court of appeal and reinstated the ruling of the trial court); State v. Helmstetter, 572 So.2d 1044, 1045 (La.1991)(upholding order to produce "prior criminal records" of state witnesses.); State v. Laird, 551 So.2d 1310 (La.1989)(ordering state to make available "rap sheets on all state witnesses in it[s] possession or available to it on its computer system[.]"); State v. Miles, 569 So.2d 972 (La.1990) (ordering the state to furnish "rap sheets of [its] principal witnesses[.]");[5]State v. Lee, 531 So.2d 254 (La.1988) (noting that the state's statutory discovery obligations are not predicated upon "whether an article is contained in the [DA's] file...."); State v. Harvey, 358 So.2d 1224, 1230-1233 (La.1978) (remanding for a determination whether the state suppressed "material" evidence, including prior arrest records of state witnesses and, if so, to order a new trial). These decisions follow Louisiana's tradition of giving wide latitude in matters of cross-examination as a means of safeguarding a defendant's constitutional right to confront and to a fair trial. Notably, the right to demonstrate a witness's partiality through evidence of prior arrests does not lie exclusively with the defense. See Clark, 492 So.2d at 869 (state use of prior arrest *387 record to impeach defense witness); Sweeney, 443 So.2d at 529.
At a hearing held March 25, 1997, defense counsel reiterated requests for NCIC reports and rap sheets, emphasizing that the defense was interested only in the records and deals of the four eyewitnesses. The trial court took the matter under advisement, and denied the motion. As stated above, the state has an affirmative due process obligation to divulge information which is favorable to an accused and material on the issues of guilt or punishment or the credibility of a witness whose reliability may be determinative of guilt or innocence or affect the outcome of trial. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490 (1995). Thus, the trial court's decision not to order the state to divulge the NCIC reports and rap sheets is clearly in error.[6]
Although we find the trial court erred in denying the disclosure motion, as set out more fully below, the defense nonetheless fails to demonstrate prejudice from nondisclosure and thus fails to persuade this court that the trial court's ruling constitutes reversible error.
In the present case, the record contains the rap sheets of the victim, the defendant, principal witnesses Owens, Sterling and Domengeaux, a neighbor of the victim, and Ementie Bowie, the defendant's mother. Assuming the accuracy of information contained on those documents, no charges arising from the events of January 17 were filed against Owens, Sterling or Domengeaux.[7] Whether the rap sheets are accurate and whether the defense had access to them at trial is a question which cannot be ascertained based on the record. Yet it can be said that counsel generally avoided cross-examining witnesses about their criminal records, even when opportunity presented itself. For example, Fort was questioned by defense counsel about being arrested in this case, a probable reference to her arrest as a material witness on the eve of trial, a matter reflected in court filings.[8] Fort acknowledged the arrest, then volunteered the existence of "prior warrants [outstanding] from years ago." She also admitted using a false name and address at the hospital, and to avoiding investigators since January of 1996 because she had warrants for "Child-juvenile court." Defense counsel failed to pursue this line of questioning. Strangely, however, during questioning of a neighbor who merely identified photos of the victim, counsel mentioned the witness's rap sheet then asked how many convictions he had. Still stranger, counsel did not press Sterling about pending charges dating from December of 1993, or two months short of his twentieth birthday, for first degree murder of a police officer, resisting arrest, criminal trespass and contempt of court. In fact, neither side questioned Sterling on this point. Nor did defense counsel seem interested in the fact that data contained on the rap sheet of Owens did not track his direct testimony adduced by the state on direct. Counsel not only did not ask Owens about his convictions but deliberately cut-off state exploration of pending *388 charges and made no attempt to follow up testimony elicited on direct that the state made no promises about a pending charge.[9]
The state should have been ordered to divulge any information material to credibility of witnesses who were present at the murder and who were therefore essential to the prosecution case. However, while the defense was entitled to the rap sheets reflecting the criminal histories of primary witnesses such as the four eye-witnesses here, the record is not clear whether counsel lacked access to the rap sheets in the record or had access but simply did not use the rap sheets. Nor would the record support claims that counsel was somehow prevented from following relevant lines of inquiry, including criminal histories, pending charges, or any basis for leverage by the state in the form of promises of favorable treatment in exchange for testimony.
On the showing made, no relief is due.

Voir Dire

Assignment of Error No. 1
Defendant alleges reversible error occurred when jurors tentatively selected for service were sworn but not sequestered immediately pursuant to La.C.Cr.P.art. 791(B).[10] He also contends that the fact that the final panel was sequestered or that sequestration may now be waived is of no moment, he argues, as the statutory violation mandates reversal.
The record reflects an unusual jury selection process. Prospective jurors were sworn, then examined in panels of eleven to fourteen persons. Those whose juror questionnaires indicated reservations about capital punishment, a tendency to impose it reflexively, or anyone laboring under an obvious disability or hardship were called for individual voir dire, after which cause challenges were entertained and ruled on. Thereafter, panelists were examined as a group, followed by another period when cause challenges were made and ruled on, and peremptory strikes were exercised.[11] Those remaining panelists, addressed by the district court as "[those who] have been tentatively selected" were again sworn, then sent home with instructions not to discuss the case, watch television, or read newspaper accounts of the trial. Jurors were required to check in *389 daily and to learn when to report back to court. Voir dire commenced February 22, 1999, and continued through to February 26, 1999. During this process, the district court kept a running total of the number of "tentatively selected" jurors. The matter was discussed after each panel was examined, when the cause challenges and strikes were made. At the conclusion of jury selection on February 26, a panel of twelve jurors and two alternates had been selected. All jurors had the weekend off. All jurors reported to Court on Monday, March 1, when they were sworn as a panel at commencement of trial. Thereafter the jury was sequestered.
The rule of sequestration seeks to insulate jurors from outside influences and is so important that a failure to properly sequester capital jurors has been held to constitute a lapse which this court may recognize on it own motion without a contemporaneous objection, assignment or briefing. State v. Schrader, 518 So.2d 1024, 1036 (La.1988); State v. Martin, 329 So.2d 688, 690-691 (La.1976). Yet, the defense recognizes that since the 1995 amendment to La.C.Cr.P. art. 791(B), four years before trial here, sequestration may be waived. Further, this Court has held that not sequestering jurors as they are selected and sworn in a capital case does not constitute error requiring reversal when the defense consents to waiver of sequestration. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 379-381 (counsel's agreement or acquiescence in trial court's procedure, which waived sequestration by delaying individual swearing until the entire panel was chosen and sworn, dooms any complaint).[12]
So it is in this case. The defense explicitly agreed to the procedure, as a way to reduce juror inconvenience.[13] The record contains no discussion of the agreement, yet the method was fashioned by the parties and satisfies Art. 791(B)'s requirement that "the state and the defense have jointly moved that the jury not be sequestered." See Taylor. The defendant demonstrates no prejudice and, indeed, does not even allege improper contact or influence on the jury which decided his fate.
The claim lacks merit.

Penalty Phase

Assignment of Error No. 8
The defense complains that the trial court erred in barring admission of the *390 victim's manslaughter conviction at the penalty phase of trial.
At the time of trial, La.C.Cr.P.art. 905.2(A) provided that the sentencing hearing "shall focus on circumstances of the offense, the character and propensities of the offender, and the impact the death of the victim has had on the family members..."
After presenting all of its witnesses, the defense sought to recall the victim's niece, Gertha Clay, who had given victim impact testimony during the state's penalty phase case-in-chief. The matter was discussed off-the-record, then at a recorded bench conference. During the bench conference, the district court announced that it would allow Clay to be recalled but not questioned on whether her opinion of the victim would change if she knew of his 1956 manslaughter conviction, a matter occurring before she was even born.[14] Defense counsel argued to no avail that the door was opened by Clay's testimony that the victim "was a good man to all people," "good to everybody" "a nice man, that type of thing." The defense contends that the conviction is admissible under La.C.Cr. P.art. 905.2(A), and was material to counter the state's distorted portrait when, in fact, John Smith was "buying sex with crack ... operating a crack house," and had "victims of his own, including the crack heads testifying [for the state]" and the "poor soul sent to his maker in 1956[.]"
In support of his contention that the victim's prior conviction should have been presented to the jury, defendant relies on the present version of La.C.Cr.P. art. 905.2(A), which states that the sentencing hearing "shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim ...." 1999 La. Acts 783 (eff. January 1, 2000)(emphasis added).
Although the applicable version of Art. 905.2(A) said nothing about the character and propensities of the victim, for as long as victim impact evidence has been permitted in capital sentencing hearings, courts have recognized a dark potential in the reciprocal right of a defendant to rebut that evidence. In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court first disfavored victim impact evidence, in part because it feared "a mini-trial" on the question of the victim's character:
Putting aside the strategic risks of attacking the victim's character before the jury, in appropriate cases the defendant presumably would be permitted to put on evidence that the victim was of dubious moral character, was unpopular, or was ostracized from his family. The prospect of a `mini-trial' on the victim's character is more than simply unappealing; it could well distract the sentencing jury from its constitutionally required taskdetermining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime.

Booth, 482 U.S. at 507, 107 S.Ct. at 2535.
The Supreme Court subsequently changed its mind about the admissibility of a limited amount of victim impact evidence under the Eighth Amendment and overruled Booth. See Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, Payne did not challenge the premise underlying Booth's concerns about a mini-trial of the victim's character:

*391 In many cases the evidence relating to the victim is already before the jury at least in part because of its relevance at the guilt phase of the trial. But even as to additional evidence admitted at the sentencing phase, the mere fact that for tactical reasons it might not be prudent for the defendant to rebut victim impact evidence makes the case no different than others in which a party is faced with this sort of a dilemma. As we explained in rejecting the contention that expert testimony on future dangerousness should be excluded from capital trials, `the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party.' Barefoot v. Estelle, 463 U.S. 880, 898, 103 S.Ct. 3383, 3397, 77 L.Ed.2d 1090 (1983).

Payne, 501 U.S. at 823, 111 S.Ct. at 2607 (emphasis added).
A defendant has no right to foist a spurious reputation on a jury. State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, 165-66 ("Neither law nor justice permits a defendant to foist a spurious reputation upon a jury because the state is so limited in its cross-examination of the character witnesses.") Similarly, the state has no right to distort the victim's character for its own purposes. This Court recognized as much in State v. Bernard, 608 So.2d 966, 971 (La.1992) when it set out the parameters for admitting victim impact evidence in Louisiana and noted:
Victim worth evidence, being a two-edged sword, is particularly dangerous. If the prosecutor can introduce evidence of the degree of the victim's social standing or business or professional success, the defense arguably will be obliged to present degrading evidence about the murder victim in the appropriate case in order to show lack of victim worth.
Based on the above, we find that the trial court erred in preventing defense counsel from cross-examining the victim's niece about, and then introducing extrinsic evidence of, the victim's prior conviction for manslaughter. However, the remoteness of that conviction went only to the weight the jury might give the evidence, not to its admissibility. State v. Martin, 458 So.2d 454, 462 (La.1984)("[S]uch time considerations generally go to the weight of the evidence rather than to its admissibility.").
Nevertheless, based on the record and the totality of circumstances, we conclude that the trial court's error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The remoteness of the conviction minimized its probative value in revealing the victim's character at the time of his death and in the end, it is not likely that jurors were deceived. Eyewitness testimony established that the victim traded drugs for sex, that he gambled and drank to excess, and that he allowed crack cocaine to be smoked in his home. From the outset the state described him as flawed and as a man with vices.
This assignment lacks merits.

CAPITAL SENTENCE REVIEW
Article I § 20 of the Louisiana Constitution prohibits cruel, excessive or unusual punishment. Pursuant to La. C.Cr.P.art. 905.9 and Louisiana Court Rule 28, this Court reviews every sentence of death to determine if it is constitutionally excessive. In making the determination the Court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; *392 whether the evidence supports the jury's findings with respect to the statutory aggravating circumstances; and, whether the sentence is disproportionate considering both the offense and the offender.[15]
Defendant David Henry Bowie is an African American male, who was 24-years-old at commission of the offense. He was one of six children born to his mother. His mother was fourteen when the defendant was born. He was raised by his maternal grandmother, as his own mother was addicted to drugs and lacked stability. Assessments done in connection with this proceeding revealed that the defendant had been raised in a good, stable home. He is free of mental disease but suffers from a learning disability and low intellectual functioning. His IQ is 78, in the borderline range. Bowie repeated the sixth, seventh and eighth grades. He was 16-years-old in the eighth grade and reads at a second grade level.
Bowie experimented early with drugs and alcohol, perhaps at the age of thirteen or fourteen. Subsequently he began running drugs, primarily cocaine, in his neighborhood. As a juvenile he was arrested four times, three times for drug offenses and was adjudicated a delinquent in 1987 at the age of 16. As an adult, and prior to the time of the murder, defendant had four arrest and one conviction in 1994 for possession of cocaine, for which he was sentenced to three years. He was paroled in July of 1995, and was still on parole at the time of the murder in January of 1996.
The defendant is the father of three children, all with the same mother. The children were ages nine, eight and seven at the time of trial. His contribution to their support is unknown.
The victim was an elderly African-American male. He and the defendant knew each other slightly. The murder was committed in the victim's home, after the defendant lost money to the victim in a dice game. Four other individuals were in the house at the time of the murder, all of whom testified for the state against the defendant.
In mitigation, the defense emphasized Bowie's lack of violence prior to the murder, his potential for making a positive contribution to society and family, and the inappropriateness of the ultimate penalty in this case. Counsel urged jurors to vote for life.

Passion, Prejudice or Arbitrary Factors
A danger of arbitrariness arises in connection with the criminal history records of the eye-witnesses. In a case predicated squarely on credibility, counsel's failure to assure access to and optimum utilization of impeachment information on these essential witnesses is inexplicable. On the other hand, as stated above, if counsel had the information requested by the defense, and not simply what the state may have chosen to provide, but did not use it, no strategic reason would support that choice. The issue also implicates the prosecution's independent obligation to disclose favorable material to the defense, Kyles, which of course includes impeachment data on crucial witnesses. Giglio, 405 U.S. at 153, 92 S.Ct. at 766; Bagley, 473 U.S. at 676, 105 S.Ct. at 3380; Vale, 666 So.2d at 1072. The witnesses' criminal histories as well as the prosecution's failure to disclose favorable material does not appear to have injected any arbitrariness in the proceedings.

*393 Aggravating Circumstances

Jurors returned the following statutory aggravating circumstances: the offender was engaged in the perpetration or attempted perpetration of second degree kidnapping or armed robbery; the offender knowingly created a risk of death to more than one person; the offense was committed in an especially heinous, atrocious and cruel manner; and, the victim was older than sixty-five years of age. La.C.Cr.P.art. 905.4(A)(1), (4), (7) and (10).
The defense complains that the evidence is insufficient to support the aggravating circumstances beyond a reasonable doubt. This does not include a challenge to the jury's finding with respect to armed robbery and attempted armed robbery. In any event, we do find that several of the defense's complaints are valid.

Second Degree Kidnapping:
We fail to see that the state established that the murder was committed during a second degree kidnapping. The state argued that this offense was committed while defendant was armed, R.S. 14:44.1(A)(5), when he forcibly moved the victim from one room to another in his home or when he enticed Domengeaux and Fort with drugs to accompany him from the scene in the victim's car. R.S. 14:44.1(B)(1), (2). Whether the women left unwillingly is debatable, given the ample opportunity before and after the murder to quit the defendant's presence. It is more than debatable that the murder of Smith occurred during commission of a second degree kidnapping under the facts here. There is no debate, however, that the state failed to establish a forcible seizing and carrying "from one place to another" with respect to movement of the victim from room to room. While no particular distance need be traveled, this Court has interpreted the phrase to require "evidence that the offender relocated the victim from one physical setting or environment to another." State v. Davillier, 99 1204, (La.12/10/99), 752 So.2d 149, 150 (relocating a victim from one side of a truck to the other does not satisfy the substantial coerced movement from the immediate physical environment in which the assault occurs and does not constitute second degree kidnapping); State v. Arnold, 548 So.2d 920, 926, (La.1989) ("[a] robber's moving a victim at knife point from one room to another for the purpose of opening a safe arguably should not be punished as a kidnapping."). The state's evidence produced at trial does not establish the substantial movement required for a carrying "from one place to another." R.S. 14:44.1(B)(1), (2); Davillier, 752 So.2d at 150; State v. Arnold, 548 So.2d at 927. Accordingly, this aggravating circumstance defined in Art. 905.4(A)(1) is not established and cannot support imposition of the death penalty.

Risk of Death to More Than One Person:
The state also failed to prove that the defendant created a risk of death or great bodily harm to more than one person. Art. 905.4(A)(4). While this aggravating circumstance does not require specific intent and while it "encompasses a broader range of conduct than the first degree murder definition in [the parallel] R.S. 14:30(A)(3)," State v. Robertson, 97-0177, (La. 3/4/ 98), 712 So.2d 8, 42, quoting State v. Johnson, 541 So.2d 818, 826 (La.1989), nevertheless, there is no conduct or behavior of the defendant's which supports the finding. The eye-witnesses testified uniformly that the defendant never threatened them and did not point the .38 revolver at them. His behavior towards them did not alter until much later, at a time when he, Owens and the two women were in the Lincoln. Then he turned and fired *394 into the back seat occupied by Fort and Domengeaux. Firing a semi-automatic weapon inside a car occupied by four people creates the risk of death or great bodily harm to more than one person, but the conduct was removed geographically and temporally from the murder of John Smith. Accordingly, this aggravating circumstance is not established and cannot support imposition of the death penalty.

Especially Heinous, Atrocious, Cruel:
Contrary to defense suggestions, the district court did in fact issue a limiting instruction. See Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The court charged jurors that, to return this aggravating circumstance, "there must exist evidence from which you can find beyond a reasonable doubt that there was torture or the pitiless infliction of unnecessary pain on the victim."
This Court has long required a narrowing construction, requiring that there must exist elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death to support this aggravating circumstance. State v. Brogdon, 457 So.2d 616, 630 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985); State v. Sawyer, 422 So.2d 95, 101, (La.1982); State v. Sonnier, 402 So.2d 650, 659 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). Further, the murder must be one in which the death was particularly painful and carried out in an inhuman manner. State v. Baldwin, 388 So.2d 664, 677 (La.1980). A finding that the wounds were inflicted to kill, not to maim or inflict pain, may but does not necessarily preclude a finding that the murder was especially heinous, atrocious or cruel. State v. Tassin, 536 So.2d 402, 411 (La. 1988).
At trial, the pathologist testified that the elderly, 5'8" 135 pound, victim died by ligature strangulation. Two ligatures were employed, shoelaces and a cord from an electric iron. The victim's nasal cavities were packed "real tight" with tissue paper. Some tissue paper also was found in the mouth. In strangulation deaths, blood vessels are occluded or prevented from returning blood to the lower body. In such an "agonizing death," involving stress, tension and pressure, Dr. Suarez testified, all bodily fluids often may be evacuated. The victim was still alive when the ligatures were tightened, breaking the hyoid bone and causing acute hemorrhage in the larynx. The victim was "an old man" who had emphysema, high cholesterol and smoked too much. Given his general condition, Dr. Suarez estimated that the victim would have lost unconsciousness "between two and three minutes," and within five to ten minutes have lost pulse and cardiac rhythm. Any sound of gagging or labored breathing which may have suggested that the victim was alive actually may have been caused by a combination of phlegm, mucous and air strapped in the trachea. This may have occurred when the victim was, in fact, "in the latter stages of unconsciousness, leading to death." Dr. Suarez could not tell which ligature was placed first, and testified that "either or both" killed the victim. It was also the doctor's view that the tissues in the nasal passages did not contribute to death, not when there was a "deep compression of the windpipe at [the neck] level." Cause of death was asphyxia.
No one could argue that this was a pleasant death or that it came without pain or the loss of great personal dignity for the victim. On the other hand, prolonged torture is not present. State v. Hamilton, 92-1919,(La.9/5/96), 681 So.2d 1217, 1227 ("The issue is not close. The victim suffered *395 gross physical abuse," was killed in "inhumane, particularly painful manner, and he died while being tormented and tortured.") (victim was bound with electric cord, some of which was wrapped around his neck; stabbed five times in the throat, hit in the face, skull and forehead with something like a claw hammer; salt had been poured over his eyes, face and down his throat, and he was strangled to death); State v. Castleberry, 98-1388, p. 31 (La.4/13/99), 758 So.2d 749, 774 (defendant forced the victim to look at him before beating him about the head with an iron skillet with such force that the skillet broke and then, finding him still alive, smothered him to death, all while the victim was bound and gagged); State v. Rault, 445 So.2d 1203, 1219 (La.1984) (victim was raped, strangled, stabbed in the neck and shot twice; Court specifically notes victim's intense mental, as well as physical, pain during the ordeal); State v. Flowers, 441 So.2d 707, 718 (La.1983) (70-year-old widow was severely beaten, raped and strangled in her home); State v. Willie, 436 So.2d 553, 556-57 (La.1983) (victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed). Accordingly, the aggravating factor of Art. 905.4(A)(7) is not established and cannot support imposition of the death penalty.

Age of Victim:
This Court has never explicitly addressed the validity of the victim's age as a factor elevating a killing to first degree murder or as an aggravating circumstance supporting imposition of the death penalty. State v. Gradley, 97-0641 (5/19/98), 745 So.2d 1160 (Unpub.Appx. pp. i-iii)(Court rejects capital defendant's claims that the victim's age is an unconstitutional basis for defining a crime as the classification is irrational and violates equal protection, and that it permits the arbitrary and capricious imposition of the death penalty)(legislature may define crimes depending on the age of the victim to safeguard the welfare of those more in need, and has acted appropriately in classifying certain murders eligible for death based on the victim's age). However, based on the record, the evidence does not support this aggravating circumstance and it cannot support the death penalty.

Armed Robbery:
The defense wisely makes no claim of evidence insufficiency with respect to proof that the defendant, while holding a gun, took the victim's gambling winnings from a front pocket and left the scene in the victim's automobile, conduct satisfying all elements of the offense of armed robbery beyond a reasonable doubt. R.S. 14:64. See State v. Nelson, 459 So.2d 510, 518 (La.1984) ("Apart from the automobile, Nelson took [the victim's] money which constitutes something of value.") (affirming conviction of first degree murder and sentence of death). A similar conclusion is reached with respect to the armed defendant's attempts to gain access to the victim's safe, conduct satisfying all elements of the offense of attempted armed robbery. R.S. 14:27, R.S. 14:64. The evidence supports beyond a reasonable doubt the statutory aggravating circumstance defined by Art. 905.4(A)(1) and supports imposition of the death penalty.

Analysis of Aggravating Circumstances
This Court has held on numerous occasions that the failure of one or more statutory aggravating circumstances does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Wessinger, 98-1234, p. 16 (La.5/28/99), 736 So.2d 162, 192, cert. denied, 528 U.S. 1050, *396 120 S.Ct. 589, 145 L.Ed.2d 489 (1999); State v. Letulier, 97-1360, (La.7/8/98), 750 So.2d 784, 799. Evidence of the invalid aggravating circumstances in this case did not interject an arbitrary factor into the proceedings because evidence of the defendant's conduct, the behavior of the eyewitnesses, the victim's injuries and the circumstances leading up to and following the murder were relevant and properly admitted at trial. Further, the remaining aggravating circumstance, i.e., that the offender was engaged in the perpetration of an armed robbery, and attempted armed robbery were amply supported. Hence, no arbitrary factors were interjected into the proceedings. See State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, 1242.

Proportionality
While the federal constitution no longer requires a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), nevertheless, comparative proportionality review remains a relevant consideration in determining the issue of excessive punishment in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990); State v. Casey, 99-0023, p. 25 (La.1/26/00), 775 So.2d, 1022, 1041. It remains the case that this Court has set aside only one capital sentence on grounds that it was unconstitutionally excessive. See State v. Sonnier, 380 So.2d 1, 9 (La. 1979); See also State v. Weiland, 505 So.2d 702, 707-710 (La.1987).
Review of similar cases on a statewide basis does not suggest that the punishment is disproportionate. Rather, Louisiana juries "appear prone to impose capital punishment for crimes committed in the victim's home." Casey, p. 26-27, 775 So.2d at 1042 (collecting cases). This Court has observed that a murderous assault by an intruder in what the victims surely believe was the safety of their own home is "a particularly terrifying sort of crime to decent law-abiding people." Casey, p. 27, 775 So.2d at 1042, quoting State v. Wingo, 457 So.2d 1159, 1170 (La.1984). Examples include: State v. Edwards, 97-1797 (La 4/2/99), 750 So.2d 893 (home invasion by armed intruder who, after asking wife where the money was, shot her twice in the head and left husband for dead after shooting and pistol-whipping him and also asking where the money was); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (elderly couple killed by an intruder who twice entered their home to remove items for pawning; at the second entry they awoke and were stabbed to death); State v. Hamilton, 92-1919 (La.9/5/96), 681 So.2d 1217 (priest in home/rectory was bound, tortured pitilessly, stabbed, bludgeoned and strangled; the offenders fled in a vehicle belonging to the victim); State v. Tart, 92-0772(La.2/9/96), 672 So.2d 116 (70-year-old husband and his 66-year-old wife died as result of multiple stabbing and cutting wounds in their home; both were bound and jewelry used in their business was spread on a dresser); Wingo, supra (Wingo and co-defendant Glass escaped from a parish prison; they entered the home of the couple, bound and gagged them, ransacked the house, stole a large amount of money, weapons and clothing, then killed the victims execution-style each with a single shot to the back of the head).
Consequently, based on the above, we find the defendant's death penalty is not disproportionate.

DECREE
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his *397 petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State postconviction proceedings, if appropriate, pursuant to its authority under La. Rev.Stat. § 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
WEIMER, J., concurring.
I concur for the following reasons.
The current version of LSA-C.Cr.P. art. 905.2(A) opens the door for the defendant to introduce evidence of the "character and propensities" of the victim. Nevertheless, the trial court must balance the relevance of this evidence so as to avoid a trial on the victim's worth. Obviously, the more evidence introduced by the state in portraying the victim's outstanding traits, the more latitude must be afforded the defense in establishing lack of victim worth.
NOTES
[1] The death certificate reflects the victim's name as "General John Smith, Jr." However, to his family he was simply "John Smith." The prosecutor often called Smith "The Fish Man," a reference to his occupation, which was selling fish from the back of his truck.
[2] Defense counsel conceded in guilt phase closing argument that his client was a drug dealer with two prior (unspecified) convictions.
[3] The assignments of error not discussed in this opinion do not represent reversible error and are not governed by clearly established principals of law. They are reviewed in an appendix that will not be published but will comprise part of the record in this case.
[4] See Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)(exculpatory and impeaching evidence in police files consisting of letters to a detective from a crucial eye-witness and the officer's notes of interviews with her, all of which cast significant doubt on portions of her trial testimony)(relief ultimately denied over insufficient prejudice shown)(Souter, J., dissenting, finding confidence in outcome undermined); State v. Ortiz, 567 So.2d 81, 82-83 (La. 1990)(on remand the court of appeal will reconsider whether DHHR records contain material impeachment evidence under Brady and Giglio and, if so, order it disclosed); State v. Ates, 418 So.2d 1326, 1328-1331 (La.1982) (error to deny in camera examination of grand jury testimony and statements to police and others by the "chief prosecution witness [whose] testimony went directly to the issue of guilt;" if on remand material inconsistencies carrying impeachment value are found, new trial must be granted); State v. Cobb, 419 So.2d 1237, 1241-1242 (La.1982) (error to deny defense access to police radio logs; on remand judge will decide if any are materially inconsistent with officer's account and, if so, to order retrial); State v. Peters, 406 So.2d 189, 190-91 (La.1981)(for good cause, trial court will conduct an in camera inspection of the grand jury testimony of the state's key witness in capital trial for exculpatory or impeaching evidence).
[5] In Miles, the state continued to resist disclosure of rap sheets. In two subsequent writ grant notes this Court made clear that the information would be divulged. See State v. Miles, 571 So.2d 636 (La.1990)(clarifying initial ruling and "order[ing the state] to immediately furnish defendant [with the rap sheets of] principal witnesses other than that of a confidential informant[.]") (emphasis in original); State v. Miles, 572 So.2d 75 (La.1991)(ordering the trial court "to enforce its order ... requiring the district attorney to obtain the date of birth of [a named] state's witness ... and to furnish the defendant with a copy of his rap sheet prior to trial[.]").
[6] It should be noted that the record is void of NCIC reports. Although the record does contain rap sheets, the rap sheets contained therein reflect a printout date of February 18, 1999, or four days before trial. Thus, an examination of the state's case file either at the time of the hearing or the ruling on the disclosure motion, therefore, would not have revealed the rap sheets.
[7] The status of Fort, the fourth eye-witness, cannot be determined because her rap sheet does not appear in the record.
[8] Fort and Domengeaux were arrested as material witnesses, and Fort's warrant reflects an alias.
[9] Owens's rap sheet reflects a birth date of June 29, 1974, and adult convictions for theft (1992)(three years DOC; suspended; probation); illegal possession of stolen things (1993) (four years DOC; three years suspended; probation until 6/1/97); and, unauthorized use of a movable (1994)(two years). He was on probation at the time of the murder. Pending at the time of trial were charges of carnal knowledge of a juvenile and contempt (1998), as well as six counts of traffic, license and insurance violations (1998). On direct, Owens agreed with the prosecutor that he had but one conviction as an adult, in 1994 for illegal possession of stolen things, which misstated the year and reduced his adult convictions by two-thirds. He acknowledged a single pending charge, about which the state had made no promises. On redirect the state began to ask, "you had a girlfriend who was under the age of eighteen" but was inexplicably stopped by a defense objection that the question exceeded the scope of redirect because the topic had not been broached on cross.
[10] La.C.Cr.P.art. 791(B) provides:

In capital cases, after each juror is sworn he shall be sequestered unless the state and the defense have jointly moved that the jury not be sequestered.
[11] All cause challenges were disposed of at recorded bench conferences. Peremptory challenges were indicated silently, for the most part: attorneys would list the name of a juror sought to be struck on Peremptory Challenge Sheets and show it to the district court, which would then announce who was excused, without reference to whether by cause or strike.
[12] Unorthodox jury selection methods in other capital cases have been sanctioned tacitly. See State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922 (Unpub.Appx., pp. xiii-xv) (defense concurrence waives any error in a unique two-part procedure by which the court death qualified jurors, then later examined them on other matters and allowed back strikes; chosen jurors were sworn individually and as a panel and sequestered)(as no juror was accepted until all phases of voir dire and opportunity for back striking were complete, delay in swearing and sequestering did not violate La.C.Cr.P. arts 788 or 791; even if improper, defendant impliedly waived any complaint by acquiescing in the procedure); State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158 (Unpub.Appx., pp. iii-iv) (jurors were questioned in panels and subjected to cause challenges, then allowed to go home pending recall, some as long as two days; upon recall, they were examined as to outside contacts and whether anything changed in their earlier responses; after simultaneous peremptory strikes were exercised, jurors were sworn and sequestered) (no violation of sequestration as jurors were not sworn until after peremptory strikes; although a pre-1995 case, both sides agreed to the procedure used by the court).
[13] Defense counsel told prospective jurors that,

We did agree, [ADA Beau] Brock and I agreed, not to sequester y'all. Some jurors are sequestered [right away]. You know, if a juror is picked, boom, you go to the Hilton. And we've agreed not to do that. We're trying to make it ... [less of an] inconvenience[.]
[14] Clay had earlier testified that she was 30 years old at the time of trial.
[15] The trial court has so far failed to produce a Uniform Capital Sentence report as required by Rule 28. This Court has requested the report to complete the appellate record, which does contain the Post Sentence Investigation report which Rule 28 also requires in every capital case.