2CLARENCE E. McMANUS, Judge.
On December 7, 2000, a Jefferson Parish grand jury indicted defendant, Terrance Royal, along with Gregory Lewis and Johnny White, for the second degree murder of Tahaira Chopin in violation of LSA-R.S. 14:3o.!.[1] Defendant was also indicted for obstruction of justice in violation of LSA-R.S. 14:130.1. On December 15, 2000, defendant was arraigned on the charges and entered a plea of not guilty to both counts. After filing various pretrial motions, which were heard and denied, defendant proceeded to trial by jury on September 17, 2002.
After a three-day trial, a 12-person jury found the defendant guilty as charged. Thereafter, defendant filed a motion for new trial which was denied. After waiving all delays, defendant was immediately sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the conviction for second degree murder and 40 years at hard labor on the conviction for obstruction of justice with both sentences to run consecutively. |s Subsequently, defendant made an oral motion to reconsider his sentences which was denied. This appeal followed.

FACTS

Twenty-Six-year-old Tahaira Chopin was shot and killed leaving behind two young children. Renell Jackson testified that in the early morning hours of October 15, 2000, she and Tahaira were at Club James, a bar on the corner of Silver Lilly Street in Marrero. Jackson stated that an aitercation between a group of “guys” from Bridge City and a group from Villa de Ames Apartments occurred in the club that evening. Thereafter, Jackson and Ta-haira left to go to Tahaira’s mother’s home in the Villa de Ames Apartment complex. As they walked back to the apartment, they met a mutual friend, Wayne Keller, who offered to give Jackson a ride home. Jackson and Tahaira separated and Ta-haira continued to walk toward the Villa de Ames Apartments.
Darius Clement and Dwayne Nelson were also walking toward the Villa de Ames Apartments at the same time that evening. Clement testified he had been at Club James earlier that night when the altercation occurred between the individuals from Bridge City and Villa de Ames. During the altercation, an individual by the name of Gregory Lewis “flashed” a gun. As a result, Clement returned to his home at the Villa de Ames Apartments and armed himself. After waiting at his home for a period of time, Clement observed that the street had cleared around Club James and, believing that the situation was safe, put his gun away. He then left his home and, accompanied by Nelson, walked down the street to a Shell Station.
Both Nelson and Clement testified that, after leaving the Shell Station, they walked down Silver Lilly Street towards the Villa de Ames Apartments. While walking home, Tahaira walked up behind Nelson and Clement and got their attention. Thereafter, Nelson and Clement heard someone say, “What’s up, now.” As they turned around, Nelson and Clement saw Lewis and two other individuals |4with guns aimed at them. Lewis and then the other two individuals began shooting, prompting Clement to jump behind a Lincoln Townear and then run to a nearby *1170 apartment to ask someone to call the police. As a result of the shooting, Nelson suffered a graze wound to his head.
Jackson, who witnessed the shooting, testified that, after separating from Ta-haira, she waited in front of Club James for her ride home. She then saw a car stop in the middle of the street. Three guys got out of the car and retrieved guns from underneath the hood of the car, and walked down Silver Lilly Street toward the Villa de Ames Apartments and met up with Lewis. As Lewis and the others walked towards the apartment complex, they began firing.
Sergeant Dennis Thornton of the Jefferson Parish Sheriffs Office investigated the shooting death of Tahaira Chopin. During the course of the investigation, Thornton photographed and collected various items into evidence, including photographs of a Lincoln Towncar which had been struck by bullets while parked near where the victim’s body had been found and various cartridges and projectiles recovered from the scene.
In conjunction with the investigation, Dr. Susan Garcia, a forensic pathologist at the Jefferson Parish Forensic Center, performed an autopsy. She testified that Ta-haira died as a result of a gunshot wound to the chest, which entered near her right armpit, hit the right lung, aorta, and left lung before it exited near her left armpit. Garcia also testified she discovered a second gunshot to Tahaira’s leg where a bullet entered and exited her right thigh, subsequently entering and striking a bone in her left leg. Dr. Garcia was able to recover the projectile lodged in Tahaira’s left leg. The recovered projectile, as well as the other projectile fragments and bullet casings collected into evidence by Thornton, were submitted to the Jefferson Parish Sheriffs Office Crime Lab for analysis.
IsAs a result of Thornton’s investigation, Gregory Lewis, Johnny White, and defendant were arrested. Prior to the arrests, Lewis spoke to Thornton and stated that he wanted to provide Thornton with information and suggested that he would call defendant. Thornton agreed and a telephone call to defendant was placed and the conversation was recorded. During the conversation, which was played for the jury, defendant admitted firing a gun in the direction of Clement as evidenced by the following exchange:
Lewis: Who was you shooting at?
Defendant: I was shooting at the nigga too.
Lewis: Who you was trying to hit though?
Defendant: I was shooting at Darius.
Later in the conversation, Lewis asked defendant if he still had the gun and defendant responded, “F* * * no! Man I threw that bitch in the river.” Thornton also learned that Lewis used a .44 caliber weapon in the shooting. That weapon was later turned over to Thornton by Lewis’s father. Additionally, a nine millimeter semiautomatic pistol was recovered from the home of co-defendant, Johnny White. The weapons were then submitted for forensic analysis.
Captain Louise Walzer, a firearms examiner at the Jefferson Parish Crime Lab, analyzed the various bullet casings, projectiles, and the two weapons recovered. Walzer determined that the bullet cases found on the scene were fired by a nine millimeter but not by the nine millimeter recovered from the home of Johnny White. She also determined that the projectile recovered from Tahaira’s body was not fired by either of the two recovered weapons.
Detective Eddie Klein of the Jefferson Parish Sheriffs Office, who assisted in the *1171 investigation, interviewed defendant. After advising defendant of his constitutional rights and obtaining a waiver of those rights, Klein obtained three separate statements from the defendant. The two initial statements, defendant | ^denied involvement in the shooting; however, in the third statement he admitted that he, along with Lewis and Johnny White, were shooting at Clement who at the time was walking with a girl. Defendant stated that he fired two shots from a nine millimeter toward Clement and the victim. Defendant also stated that he threw his gun into the Mississippi River underneath the Huey P. Long Bridge.
Defendant called Officer Todd Revere of the Jefferson Parish Sheriff’s Office who testified he responded to a call of shots fired at approximately 4:53 a.m. He secured the scene and attempted to gather information from witnesses. Officer Revere located Nelson near the Villa de Ames Apartment complex and offered him medical assistance. Nelson informed Officer Revere that he had seen Lewis but did not mention seeing any other individuals with Lewis.
Defendant testified in his own defense that, on the night of the murder, he was in the company of Lewis, White and Jamal Pittman at Club James when he saw an argument between two customers. Defendant and his companions then left the club and observed Lewis “running up the street” with a few other guys “when all the fire started.” After the shooting began, he borrowed a gun from an individual standing outside of the club and observed gunfire coming in his direction from behind the Lincoln Towncar. Defendant testified that he fired two shots in the direction of the vehicle in order to give him enough time to run. He ran and got into a car with Lewis and White and went home. Defendant also testified that, although he told police he threw the pistol he was using into the river, he actually returned it to the individual that he had borrowed it from.

DISCUSSION

Defendant contends that the trial court erred in restricting his cross-examination of Clement about a lenient sentence Clement received for a prior conviction and about any deal Clement may have made with the State in this case. The State responded that the trial judge did not prevent defendant from questioning 17Clement about a deal but prevented him from questioning Clement about certain aspects of his sentence. The State noted that, even if defendant’s right to cross-examination was improperly restricted, the error was harmless.
A defendant’s right to demonstrate facts and circumstances, which might influence a witness’s perceptions or color his testimony (thereby lessening the weight the fact-finder might accord the testimony), is an important function of the right to confront and cross-examine embodied in the Sixth Amendment to the United States Constitution and La. Const, art. I, § 16. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Bowie, 00-3344 (La.4/30/02), 813 So.2d 377, 385, cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002). The right to cross-examine includes the right to question the witness concerning any bias or self-interest attached to the witness’s testimony. However, the right to confrontation is not so unlimited as to require that a defendant be allowed on cross-examination of a State witness, to make any and all inquiries of whatever character. The inquiry must be relevant. State v. Howard, 01-5 (La.App. 5 Cir. 4/24/01), 786 So.2d 174, 180-181, writ denied, 01-1467 (La.4/26/02), 816 So.2d 846.
*1172 The possibility that the State may have some “leverage over a witness due to that witness’s pending criminal charges is recognized as a valid area of cross-examination.” State v. Rankin, 465 So.2d 679, 681 (La.1985). A witness’s hope or knowledge that he will receive leniency from the State in exchange for his testimony is highly relevant to establish bias or interest. State v. Bowie, supra. A witness’s bias or interest may arise from arrests, pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the State regarding the conduct. State v. Vale, 95-1230 (La.1/26/96), 666 So.2d 1070, 1072; State v. Schexnayder, 96-98 (La.App. 5 Cir. 11/26/96), 685 So.2d 357, writ denied, 97-0067 (La.5/16/97), 693 So.2d 796, cert. denied, 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997). Moreover, even after pending charges have been resolved, bias may arise from a witness’s “vulnerable status as a probationer.” Davis v. Alaska, 415 U.S. at 318, 94 S.Ct. at 1111.
On cross-examination, defense counsel questioned Darius Clement regarding his prior conviction for possession with the intent to distribute crack cocaine as follows:
Q. So you were arrested and convicted after the shooting for this?
A. Yes, sir.
Q. And when you went to — you were sentenced to seven years but you didn’t serve seven years?
A. No, sir.
Q. You got accepted to boot camp; is that right?
A. Yes, sir.
Q. Did you go to work offshore?
A. Yes, sir. That’s when I went to the work release.
Q. Okay. Does everybody in jail get to go to work offshore?
At that point, the State objected arguing that the question was speculative and irrelevant. After a discussion with defense counsel and the assistant district attorney, the trial judge sustained the objection reasoning that the decision to grant an individual work release lies with the Department of Corrections and not with the trial judge or the district attorney’s office. In further discussions, defense counsel stated his intention to question Clement as to whether the State objected to defendant receiving boot camp for his conviction. The State responded that the fact that Clement received boot camp was in no way the result of a deal made in exchange for his testimony. Thereafter, the trial judge concluded that absent any deal between the State and defendant, the questioning concerning Clement | ¡^receiving boot camp was irrelevant. Defense counsel then resumed questioning Clement on separate matters not related to his prior conviction.
In State v. Williams, 02-1406 (La.4/9/03), 844 So.2d 832, the Louisiana Supreme Court examined a similar case. In Williams, during cross-examination of a State’s witness, the defense counsel questioned the witness concerning a favorable plea bargain he had received in connection with a prior charge three months before the defendant’s trial. The prosecutor immediately objected to any questions about the nature of the witness’s plea bargain. After excusing the jury, both the prosecutor and the State’s witness denied that the plea bargain had any connection with the defendant’s case. On that basis, the trial court sustained the state’s objection and precluded defense counsel from asking the witness any more than whether he had a prior conviction. The Louisiana Supreme Court reversed and stated that “[E]ven assuming that [the witness] had no motive to protect a guilty plea premised on a specific condition (express or *1173 implied) that he would testify against relator and his codefendants, the witness may have subjectively believed that continued cooperation with the state was necessary to protect his probationary status and to forestall any chance of going to jail.” State v. Williams, 02-1406 at p. 7, 844 So.2d at 835. The Supreme Court further noted that without the full context of the proceedings set out before them, the jurors lacked any basis for assessing how much pressure the witness may have felt to cooperate with the prosecution.
Similarly in this ease, the State maintained that no deal had been made with Clement in exchange for his testimony in defendant’s trial. The State pointed out in its brief, that defense counsel was not prevented from specifically questioning Clement as to whether he had made a deal with the State for his testimony. However, the trial judge’s rulings could have precluded defendant from delving into the specifics of Clement’s sentence. We note that defense counsel was able to briefly question Clement concerning his prior conviction. Thus, were we to findlmthat the trial court erred in precluding defendant from questioning Clement about his sentence in an attempt to expose Clement’s potential bias or to reveal he was pressured to cooperate with the State, the denial of defendant’s right to confrontation is subject to a harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Sherman, 630 So.2d 321, 324 (La.App. 5 Cir.1993), writ denied, 94-0258 (La.5/6/94), 637 So.2d 1046; State v. Rosales, 498 So.2d 66 (La.App. 5 Cir.1986).
In determining harmless error it is “not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness’s testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case. Delaware v. Van Arsdall, supra; State v. Sherman, supra.
In this ease, we conclude the jury’s verdict was not attributable to the error because Clement’s testimony was cumulative in nature. The testimony mirrored the testimony of Nelson and Jackson which established that Clement, Nelson, and Ta-haira were walking toward the Villa de Ames Apartments when Lewis and two other individuals began shooting in their direction. Neither Clement nor the other witnesses identified defendant as one of the shooters. Additionally, the State L introduced substantial evidence establishing defendant’s guilt, including defendant’s own recorded statements, in which he admitted shooting in the direction of the victim and later disposing of his weapon. As a result, we find that the trial judge’s denial of defendant’s right to cross-examination as to Clement’s testimony was harmless error.
Next, defendant contends that he received an excessive sentence because he was given the mandatory life sentence for *1174 his convictions.[2] The State responded that the sentence was well within the trial judge’s discretion, considering the nature of the crimes. The United States and Louisiana Constitutions both prohibit the imposition of excessive or cruel punishment. U.S. Const, amend. VIII; La. Const, art. I, § 20. Even a sentence within the prescribed statutory limit may violate a defendant’s constitutional right against excessive punishment. State v. Sweeney, 443 So.2d 522 (La.1983); State v. Bradham, 94-71 (La.App. 5 Cir. 5/31/94), 638 So.2d 428; State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 729 So.2d 95. In reviewing a sentence for excessiveness, the appellate court must consider the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. State v. Daigle, 96-782 (La.App. 5 Cir. 1/28/97), 688 So.2d 158, 159 writ denied, 97-0597 (La.11/5/97), 700 So.2d 506; State v. Snyder, 97-226 (La.App. 5 Cir. 9/30/97), 700 So.2d 1082.
As a result of his conviction for second degree murder, defendant received the mandatory minimum sentence of life imprisonment for that crime. LSA-R.S. 14:30.1(B). However, despite having received the mandatory minimum sentence, defendant’s sentence may be reviewed for constitutional excessiveness. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Armstrong, 99-925 (La.App. 5 Cir. 2/16/00), 756 So.2d 533, writ denied, 00-2419 (La.6/1/01), 793 So.2d 182, cert. denied, 534 U.S. 1058, 122 S.Ct. 651, 151 L.Ed.2d 568 (2001). A mandatory sentence may be excessive if the sentence “makes no measurable contribution to acceptable goals of punishment or ... amounts to nothing more than the purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime.” State v. Armstrong, supra at 537. However, it is presumed that a mandatory minimum sentence is constitutional. State v. Dorthey, 623 So.2d 1276 (La.1993). To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must show that: “ ‘[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances.’ ” State v. Johnson, supra, at 676 (quoting State v. Young, 94-1636 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 528).
At his sentencing hearing, defendant failed to present any evidence or make any argument regarding a downward departure from the mandatory minimum sentence. Thus, it appears that defendant has failed to carry his burden under Johnson and, as a result, defendant’s life sentence does not appear excessive. See, State v. Bartley, 00-1370 (La.App. 5 Cir. 2/14/01), 782 So.2d 29, writ denied, 01-0717 (La.2/22/02), 809 So.2d 981.
Additionally, defendant argues that his 40-year sentence for his conviction for obstruction of justice is excessive. LSA-R.S. 14:130.1(B)(1) provides that, when the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than $1,000, imprisoned for not more than 40 years at hard labor, or both. Therefore, defendant’s 40-year sentence is the maximum term of imprisonment he could have received for a violation of LSA-R.S. 14:130.1. *1175 Generally, maximum sentences are reserved for cases involving the most serious violations of the 113offense charged and the worst type of offender. State v. Quebedeaux, 424 So.2d 1009 (La.1982), aff'd on remand 446 So.2d 1210 (La.1984); State v. Styles, 96-897 (La.App. 5 Cir. 3/25/97), 692 So.2d 1222; State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 729 So.2d 95. However, the trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. McCorkle, 97-966 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212; State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 729 So.2d 95. This Court should further consider three factors in reviewing a judge’s sentencing discretion: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Telsee, 425 So.2d 1251 (La.1983); State v. Slang, 94-332 (La.App. 5 Cir. 11/16/94), 646 So.2d 1037, 1041.
In this case, the trial judge sentenced the defendant without giving any reasons for sentencing or referencing a pre-sen-tence investigation. Therefore, we must examine whether the record supports the sentence imposed and examine sentences imposed for similar crimes.
In State v. McKnight, 98-1790 (La.App. 1 Cir. 6/25/99), 739 So.2d 343, writ denied, 99-2226 (La.2/25/00), 755 So.2d 247, the defendant, a first time felony offender, was convicted for obstruction of justice in a first degree murder case and received the maximum sentence of 40 years of imprisonment at hard labor. In McKnight, defendant was the baby-sitter of a 22-month-old child who was discovered dead in a river. Although no one was charged or convicted for the death, it was revealed that, after the child had died in defendant’s home, she threw the child’s body into a river and persuaded her son and niece to he to authorities concerning the circumstances of the child’s disappearance. The First Circuit held that the sentence was not excessive reasoning that, although a first felony offender, |14the crime involved a heinous offense and caused the victim’s family great pain and suffering.
While the facts are not as heinous as those in McKnight, defendant did dispose of a weapon which was used in the shooting of Tahaira Chopin. Adding to the seriousness of the obstruction charge in the instant case, unlike the defendant in McKnight who was not charged with the victim’s murder, defendant was convicted for the murder of Tahaira Chopin. Based on the record before us, we conclude the trial court did not abuse its wide discretion in sentencing defendant to maximum of 40 years.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent in this case.

CONCLUSION

Based on the foregoing, defendant’s conviction and sentence are affirmed.

CONVICTION AND SENTENCE AFFIRMED.

. The trials of defendant and his co-defendants were severed.

. On appeal, defendant does not specifically address the consecutive nature of his sentences nor did he specifically raise the issue of the consecutive nature of his sentences in his oral motion to reconsider sentence.