LILJEBERG, J.
Defendant, Gary M. Francois, appeals his conviction and sentence for second degree murder. For the following reasons, we affirm and remand for correction of the Uniform Commitment Order.
PROCEDURAL HISTORY
On April 9, 2015, a Jefferson Parish Grand Jury returned an indictment charging defendant, Gary M. Francois, with the second degree murder of James Vaughn, in violation of La. R.S. 14:30.1. Defendant pleaded not guilty at his arraignment on April 10, 2015.
Pursuant to a motion for psychiatric examination filed by defendant on November 10, 2015, a competency hearing was held on December 16, 2015, after which the trial court found defendant incompetent to stand trial and remanded him to the Eastern Louisiana Mental Health System. After treatment and subsequent re-evaluation, the trial court held another hearing on May 11, 2016, and determined defendant was competent to stand trial. On July 13, 2016 and July 21, 2016, defendant filed motions to reopen competency and for psychiatric examination, asserting his mental health regressed due to the failure to receive *809 his medication thereby affecting his mental capacity to proceed to trial. Defendant's competency was reassessed and on October 26, 2016, the trial court again found defendant competent to proceed to trial.
On December 1, 2016, defendant withdrew his former plea of not guilty and tendered a plea of not guilty and not guilty by reason of insanity. Trial commenced before a twelve-person jury on March 20, 2017, resulting in a verdict of guilty as charged on March 23, 2017. On May 16, 2017, defendant filed a motion for post-verdict judgment of acquittal, or in the alternative, motion for new trial. Prior to sentencing on May 18, 2017, defendant's post-verdict motion was denied. After a waiver of delays, the trial court sentenced defendant to a term of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. On June 9, 2017, defendant filed a motion for appeal, which the trial court granted on June 14, 2017.
FACTS
On Christmas Eve, December 24, 2014, defendant shot James Vaughn four times inside the Foot Locker store at the Oakwood Mall on the Westbank of Jefferson Parish. Krisha Vaughn, mother of the victim, testified that her son went to the mall with his girlfriend, Bradrika Brown, to go Christmas shopping. She testified she knew defendant from the neighborhood and recalled her son and defendant did not "get along."
Off-duty New Orleans Police Detective, Bronson Gettridge, was shopping at the Foot Locker at the time of the shooting. The first gunshot startled Detective Gettridge, who immediately took cover. After the second gunshot was fired, Detective Gettridge observed a man, later identified as defendant, dressed in white jeans and a black hooded sweatshirt firing at the victim. He explained that the third and fourth shots were fired at the victim's upper torso or head after the victim fell to the ground. Detective Gettridge was unable to get a good look at the shooter because his face was hidden under a hooded sweatshirt, but recalled his fully grown beard and use of a semiautomatic weapon.
Defendant then quickly walked out of the Foot Locker and into Forever XXI, an adjacent clothing store, where he exited through a back door and into the mall parking lot.[1] Detective Gettridge followed defendant on foot as he crossed through the parking lot, into an open field, and finally through a nearby subdivision before losing sight of defendant as he ran between buildings. Detective Gettridge testified that defendant only looked back once in his direction while he was following defendant.
During this time, Detective Gettridge placed a 9-1-1 call seeking assistance. Deputy Thomas Bryson, former employee of the Gretna Police Department, was on patrol when the request for assistance came over the radio regarding the shooting suspect described as a black male wearing white pants, a black hooded sweatshirt, and running southbound along Fredericks Street. Deputy Bryson relocated to the area where he observed defendant fitting the suspect's description running southbound on Fredericks Street and talking on his cellular phone. Deputy Bryson engaged his emergency lights and attempted to pull in front of defendant's path, but defendant was able to evade him by changing his direction and then fleeing through a nearby apartment complex. Deputy Bryson exited his vehicle and *810 chased defendant until he entered a drainage canal and was apprehended when he reached the other side.
Police then canvassed the area with the assistance of an explosion detection K-9 for objects defendant discarded during his flight. They recovered a cellular phone, a dark-colored sweatshirt, and a .40 caliber Smith & Wesson handgun. Expert forensic pathologist, Dr. Susan Garcia, testified that when performing the autopsy on the victim, she concluded he sustained four gunshot wounds to his body on his right hand, back, head, and neck area. Dr. Garcia noted the cause of death as gunshot wounds to the head, back, and face. Ballistics testing performed on the handgun revealed a match to the murder weapon and to the projectiles found inside the victim's body. Further, defendant was a major contributor to DNA found on the sweatshirt and the murder weapon.
Tevin Smith, a close friend of defendant, testified that on the day of the shooting, he called defendant and they discussed their separate plans to go shopping at Oakwood Mall. While there, Mr. Smith saw defendant and engaged in a conversation with him before parting ways. After the shooting, Mr. Smith called defendant to make sure he was safe, at which time defendant asked Mr. Smith if he could pick him up. Defendant told Mr. Smith he was by some apartments down the street from the mall.
Harriet Reynolds, and her fifteen-year-old grandson, Jared Reardon, were inside the Foot Locker at the Oakwood Mall on Christmas Eve when the shooting occurred. Ms. Reynolds testified that she did not see the shooter. Jared saw a bearded man with a hood on his head walk into the Foot Locker, pull out a gun, and shoot three or four rounds. Ms. Reynolds and Jared were transported to the police station where they gave statements. While there, Jared was shown a photographic lineup from which he identified defendant as the shooter, stating he was "about seventy to eighty percent sure."
Detective Wesley Doyle testified regarding three phone calls made by defendant while in jail on December 25, 2014, August 1, 2015, and August 11, 2015. During the first call, defendant discussed the shooting incident with an unidentified male. The male asked what happened and defendant replied that he did not know and was trying to figure it out. During the call, defendant's mother asked defendant if he "did it" and defendant did not respond. The male later asked defendant if the victim threatened him and defendant stated, "I don't know, it was like some old s***." The male then asked defendant if he snapped and defendant stated that it was something like that.
During the second call, on August 1, 2015, defendant spoke with his mother about his upcoming trial and about shaving off his beard. Defendant's mother told defendant the State only had two witnesses, one who was unable to identify him and a second witness who was only seventy percent sure defendant was the shooter. Defendant agreed the State did not have much against him. In the final recording, defendant engaged in a conversation with a friend and told him the State did not have much evidence against him.
The State rested and the defense presented the testimony of Sheryl Jones, defendant's mother, who testified that when defendant was nine or ten years old she took him for a mental health evaluation at his school's request based on comments defendant made about animals, TVs, and radios talking to him.[2] Ms. Jones recalled *811 that a physician at West Jefferson Mental Health diagnosed defendant with psychosis and placed him on Risperdal to treat his paranoia.[3] Ms. Jones explained that she weaned him off his medication in his second year of high school because he appeared to have improved.
After graduating from high school, defendant went away to college, and prior to his graduation, Ms. Jones recalled receiving a phone call from her son in the middle of the night during which he told her, "his friends or roommates, or whoever, were trying to put cookies in his head. And he didn't trust nobody."[4] Ms. Jones further recalled defendant stating that people were talking in "basketball codes" about him. When she called him back a few hours later, he seemed better.
After defendant graduated from college with his degree in criminal justice, Ms. Jones noticed several changes in her son including a loss of appetite and seclusion. Ms. Jones offered to get defendant professional help, but he declined, advising her that "he was fine." After defendant's arrest, defendant complained to his mother that he believed the deputies at the jail were poisoning his food.
Tremain Francois, defendant's brother, testified that while growing up, he heard stories from different people about defendant's mental health. Defendant moved in with him for a short time after graduating from college and he noticed a change in defendant's behavior. He testified that defendant kept to himself and was paranoid, believing he could not trust anyone. Tremain recalled one instance, a couple of months before Christmas Eve of 2014, when defendant was crying in his room after a fight with his girlfriend, Carletta Simmons. Defendant asked Tremain "What's wrong with me?" and wanted to know if he could trust certain family members and friends.[5]
Defendant's half-brother, Quintin Sanders, also recalled a time when defendant was in college, and he received a phone call from defendant who whispered into the phone about two of his classmates playing basketball and talking back and forth in code about their plans to kill him. Quintin also recalled a time when defendant thought his girlfriend, Carletta, was cheating on him, believing that she and the guy she was seeing were trying to set him up. Quintin described defendant as paranoid of everyone around him. Quintin also testified that he never saw defendant carry a gun.
Defendant's ex-girlfriend, Carletta Simmons, testified that during their two and a half year relationship in college, defendant became suspicious of everyone, including herself, and began to withdraw from those around him. She testified his paranoia became evident one day when she was with defendant and his roommates, who were talking about basketball. Defendant pulled her to the side and told her they were talking in code about him and believed that she was likely in on "the setup." Carletta recalled that defendant drove her past several apartments on campus noting that someone in one of the apartments was trying to kill him and again accused her of being involved.
*812 Gary James, defendant's father, testified that he personally suffers from depression and was diagnosed by a physician, thirty years prior, with paranoid schizophrenia and was medicated with Risperdal and Prozac. Mr. James testified that he takes the medication daily and that it helps him from seeing and hearing things. He further testified that his uncle, nephew, and defendant all suffer from the same condition.
Peter Dumas, defendant's long-time friend and college roommate, testified that while living with defendant he noticed that he slowly began to change. He testified that defendant became more isolated and paranoid, distancing himself from those around him. He recalled one instance while playing a basketball video game when defendant asked him if he had a problem with him and began questioning their friendship. Peter further recalled an instance when they were playing basketball, and defendant confronted him about the "code" talk engaged in by the other players.
Dr. Sarah Deland, expert in the field of forensic psychiatry, was retained by the defense to conduct an evaluation on defendant regarding his state of mind at the time of the shooting. She opined that defendant was suffering from schizophrenia at the time of the shooting and because of his mental illness, was unable to distinguish right from wrong. In formulating her opinion, Dr. Deland interviewed defendant seven times, reviewed his medical treatment history, interviewed family members and close friends, and reviewed the sanity commission's reports authored by Drs. Richoux and Salcedo.
Dr. Deland testified that when she first met defendant, he was very suspicious and paranoid and it was difficult to get information from him. Defendant did reveal that he experienced auditory hallucinations since he was a child, explaining that the voices he heard often conversed with each other about him. At one point, defendant expressed to Dr. Deland his concern that his legal counsel might be the police and that people poisoned his food in jail. He also talked about receiving messages through television. Dr. Deland further testified that upon his arrest, defendant was placed on suicide watch and was observed by two nurses to be suffering from some form of psychosis. Defendant later told Dr. Deland that he tried to get on suicide watch so "he could get away from the tier."
Dr. Deland testified that in the weeks leading up to the shooting, defendant became increasingly paranoid. He believed people were setting him up and that people who were out to get him were following him. Defendant further told Dr. Deland that people on the street told him to watch his back and as a result, he started carrying a weapon because he was frightened. Defendant also told Dr. Deland that on the day of the shooting he went to the mall looking for a pair of shoes for his son. He explained that when he entered Foot Locker and saw the victim, everything came together that the victim was the person responsible for the people following him and this caused defendant to pull out a gun and shoot the victim. Defendant indicated to Dr. Deland that after he shot the victim, he ran because he believed other people involved in the conspiracy might try to harm him.
Dr. Deland asked defendant whether he had a history with the victim and defendant told her that approximately ten years prior, the victim expressed anger towards defendant for unknown reasons and fired a gun in defendant's direction. Dr. Deland independently confirmed the incident through defendant's friend, who was with him at the time of the encounter. Dr. *813 Deland believed this past incident led defendant to focus on the victim in the mall and attribute him to defendant's delusion that an organized conspiracy of people were trying to set him up. In conclusion, Dr. Deland opined that after taking the totality of the circumstances into consideration, and because of his mental illness, defendant was unable to distinguish between right and wrong at the time of the shooting.[6]
Dr. Jeffery Nicholl, expert in the field of forensic psychiatry, treated defendant for competency restoration at the Eastern Louisiana Mental Health hospital while he was awaiting trial. Dr. Nicholl testified that when he interviewed defendant on February 16, 2016, he was quiet, his thoughts were vague and disorganized, and he was equivocal about whether he was having auditory hallucinations. Dr. Nicholl's diagnostic impression was a GAF (Global Assessment of Function) of 50, indicating the presence of a moderate psychiatric illness. Dr. Nicholl again observed defendant on February 25, 2016, and at that time, he found defendant exhibited increasing signs of paranoia and psychosis, stating defendant had told him he heard mumbling voices, but could not make out what they were saying. Dr. Nicholl noted defendant asked numerous questions about whether their conversations could be used against him in a court of law.
During his next encounter with defendant on March 3, 2016, defendant did not provide specific details pertaining to any paranoid delusions ; however, Dr. Nicholl observed that his general behavior seemed paranoid and he lacked any emotion, behavior he found to be consistent with schizophrenia. Unsure whether defendant suffered from a delusional disorder or schizophrenia, Dr. Nicholl treated defendant with Abilify, an anti-psychotic medication. On March 10, 2016, Dr. Nicholl again met with defendant who advised him that he occasionally had the feeling that people could control his thoughts and began questioning Dr. Nicholl on the Bennett[7] criteria used for competency to stand trial in Louisiana. He appeared paranoid to Dr. Nicholl, as if he thought Dr. Nicholl was trying to trick him.
Defendant continued on the medication, with the addition of Trazodone, a sleep aid, and on March 15, 2016, defendant denied any hallucinations or delusions. Believing the medication was working, Dr. Nicholl increased the dosage of the Abilify and rated defendant with a GAF score of 55. Dr. Nicholl again saw defendant on March 23, 2016, noting that defendant occasionally glanced to his side in a suspicious manner, but denied hallucinations or delusions. Approximately one week later, defendant began to refuse his medication, which seemed to cause deterioration as defendant became more paranoid and disorganized in his thinking. Defendant began taking his medication again and was last seen by Dr. Nicholl on April 5, 2016, during which he reported defendant as having a delusional disorder of the paranoid type. Defendant was then found competent to proceed to trial and returned to the court system.
In rebuttal, the State called Dr. Richard Richoux, a Jefferson Parish jail psychiatrist who was qualified as an expert in the field of forensic psychiatry. Dr. Richoux testified that he first met with defendant on January 28, 2015, after he was placed on suicide watch in the jail. Upon evaluation, *814 Dr. Richoux believed defendant suffered from an adjustment disorder due to stress from external circumstances. Dr. Richoux noted defendant was not suicidal or psychotic and merely wanted to be moved to another location in the jail. Dr. Richoux again saw defendant on February 18, 2015, reporting that defendant was not psychotic or suicidal and was still suffering from an adjustment disorder.
On December 2, 2015, Dr. Richoux and Dr. Rafael Salcedo[8] were appointed by the court to evaluate defendant's competency to proceed to trial. During their meeting with defendant, they learned he received psychiatric treatment as a child, but defendant was unable to provide details. He reported that he experienced auditory hallucinations intermittently for a number of years, and it appeared that his thought process was disorganized. Dr. Richoux opined that defendant was likely suffering from schizophrenia despite his two prior interactions with defendant during which no psychotic symptoms were present. After questioning defendant concerning the Bennett criteria, Drs. Richoux and Salcedo believed defendant to be impaired in his ability to rationally assist his counsel, thus, recommending defendant be found incompetent to proceed to trial and remanded to a mental health hospital.
Drs. Richoux and Salcedo re-evaluated defendant's competency on April 27, 2016, after defendant's two-month hospital commitment, and agreed with the treatment team at the hospital that defendant achieved competency, feeling that he was not manifesting any psychotic symptoms. Drs. Richoux and Salcedo again evaluated defendant on August 3, 2016, at the instruction of the court because defendant's counsel believed his competency deteriorated due to issues at the jail which caused defendant to have missed dosages of his prescribed medication. Their finding, despite the fact that he was off his medication, was that defendant did not exhibit any psychotic symptoms nor did he have any difficulties responding to questions related to the Bennett criteria. Thus, it was recommended that defendant be found competent to proceed to trial.
Dr. Richoux was also hired by the State to evaluate defendant's sanity at the time of the offense, which he explained differs from competency to proceed to trial, in that sanity deals with a person's ability to distinguish right from wrong. Dr. Richoux testified that the presence of psychotic symptoms or a mental illness does not automatically equate with the inability to distinguish right from wrong. Dr. Richoux conceded that defendant suffers from a psychiatric disorder, whether schizophrenia or a delusional disorder, but stated that in his medical opinion, despite his psychiatric disorder, defendant could distinguish right from wrong at the time of the offense.[9]
Dr. Richoux explained the factors that went into his medical opinion, including, defendant's varied degrees of functioning over time which indicated that at some points defendant was asymptomatic and functioning at a high enough level to complete his college degree in the absence of treatment. Dr. Richoux further opined that for defendant to be unable to distinguish right from wrong at the time of the offense on the basis of paranoia, he had to distort *815 reality in such a way that he would have felt he was acting in self-defense. He clarified that psychotic motivation, i.e. when a person's actions are driven by psychotic thoughts, does not equate with the inability to distinguish right from wrong.
Dr. Richoux testified that defendant's behavior on the day of the shooting does not comport with the actions of someone who became more and more paranoid in the weeks prior to the shooting. He explained defendant made a conscious decision to go to Oakwood Mall on Christmas Eve at the busiest time of year, despite his paranoia regarding a conspiracy against him. Dr. Richoux concluded this was atypical behavior for a paranoid person. He further noted that defendant's actions exhibited in the mall surveillance video do not appear to be those of a person who is acutely paranoid.[10] In the video, defendant stood in front of Foot Locker for four minutes before entering the store. Dr. Richoux found this detail important, reasoning that a paranoid person standing for four minutes has the opportunity, if their paranoia overcomes them, to remove themselves from the situation and is not indicative of someone in fear for his life. Instead, he believed the video depicted defendant as the aggressor as he moved towards the victim while drawing a gun, pointing it at the victim and then shooting him.
Dr. Richoux also testified that after the shooting, defendant entered the adjacent store and did not appear panicked, but attempted to blend in with the crowd exiting the mall. Dr. Richoux believed that in his medical opinion, such actions do not comport with a person who is in a state of panic and anxiety about people out to get them. During his flight, defendant also discarded the murder weapon, which Dr. Richoux reasoned is counterintuitive for a person in acute fear for his life and of someone who believes others are involved in a conspiracy against him. Dr. Richoux also noted that on the day following the shooting, defendant indicated in a recorded jail telephone conversation that the shooting occurred because "it was some old s***," which Dr. Richoux believed referred to the past incident when the victim fired a gun in defendant's direction.
DISCUSSION
In defendant's first assignment of error, he argues his conviction is not supported by the evidence since no rational trier of fact could have found defendant failed to carry his burden of proving by a preponderance of the evidence that he was insane at the time of the offense.
In Louisiana, the law presumes a criminal defendant is sane. La. R.S. 15:432 ; State v. Abbott , 11-1162 (La. App. 5 Cir. 5/31/12), 97 So.3d 1066, 1068. To rebut this presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. Id. ; La. C.Cr.P. art. 652. This burden is not borne by proving the mere existence of a mental disease or defect. Id. Rather, to be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect which prevented him from distinguishing between right and wrong at the time he committed the conduct in question. La. R.S. 14:14.
The determination of sanity is a factual matter. Abbott , 97 So.3d at 1068. In considering an accused's plea of not guilty and not guilty by reason of insanity, the trier of fact must first determine whether the State has proven the essential elements of the charged offense beyond a reasonable doubt. Id. at 1068-69. The trier *816 of fact may then proceed to the determination of whether the defendant was incapable of distinguishing between right and wrong at the time of the offense. Id. at 1069.
All evidence, including both expert and lay testimony, along with defendant's conduct and actions before and after the crime, may be considered in determining whether the defendant has met his burden of proof. Id. at 1069. A determination of the weight of the evidence is a question of fact that rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. State v. Williams , 07-1407 (La. 10/20/09), 22 So.3d 867, 875-76, cert. denied , 560 U.S. 905, 130 S.Ct. 3278, 176 L.Ed.2d 1184 (2010).
On review of a claim for sufficiency of evidence in an action where an insanity defense has been raised, an appellate court, applying the standard outlined in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact-finder, viewing the evidence in a light most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. Id.
In the present case, defendant was charged with second degree murder in violation of La. R.S. 14:30.1, which is defined as the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. Defendant changed his initial plea of "not guilty" to the plea of "not guilty and not guilty by reason of insanity." The jury rejected defendant's insanity defense, finding him guilty as charged. Defendant does not argue the State failed to prove the elements of the offense. Rather, defendant contends he met his burden of proving by a preponderance of the evidence that he did not know right from wrong at the time of the offense and, therefore, should be exempt from criminal responsibility.
On appeal, defendant maintains he met his burden through the expert testimony of Dr. Deland, who testified defendant was unable to distinguish right from wrong at the time of the offense. He also argues that testimony from several defense witnesses established his medical history and behaviors leading up to the shooting, including his diagnosis of schizophrenia causing auditory hallucinations and paranoia which deluded him into believing he had to protect himself from the victim whom he thought to be part of an ongoing conspiracy against him.
In this case, expert witnesses disagreed as to defendant's sanity. The decision about which witness to believe belongs to the jury and should not be overturned on appeal unless an abuse of discretion can be shown. State v. Johnson , 43,935 (La. App. 2 Cir. 2/25/09), 3 So.3d 697, 704.
In support of his insanity defense, defendant offered the testimony of certain family members and friends. Mrs. Jones, defendant's mother, testified regarding defendant's auditory hallucinations, which began at a young age, and his alleged diagnosis of psychosis, which she claimed was treated with Risperdal up until high school, despite lack of medical records substantiating this testimony. Mrs. Jones, Quintin (defendant's half-brother), and Tiara (defendant's sister) also testified regarding an incident in college when defendant called them acting paranoid about his friends whom he believed were talking in *817 code about how they were out to get him. Further, defendant's brother (Tremain), and his ex-girlfriend (Carletta), recalled an incident which occurred a few months prior to the shooting when defendant broke down crying, skeptical about which family members and friends he could trust. Carletta also told the jury that while dating defendant during college, he accused her of being part of a conspiracy to have him killed.
Both State and defense experts agreed that defendant suffered from schizophrenia, a psychiatric disorder; however, their opinions diverged as to whether defendant could distinguish right from wrong at the time of the shooting. Defense expert psychiatrist, Dr. Deland, testified that in her medical opinion, defendant was suffering from schizophrenia at the time of the shooting, and because of that mental illness, was unable to distinguish right from wrong. Dr. Deland relayed the information she obtained from her interactions with defendant, including his paranoid behavior and his commitment to a forensic hospital for treatment after initially being found incompetent to stand trial. She discussed defendant's treatment with certain anti-psychotic medications that effectively restored his competency to proceed to trial. It was her opinion that defendant's actions at the time of the shooting were fearful in nature based on a psychotic motivation in which he believed the victim was behind a plot against him. She explained that in the weeks leading up to the shooting she understood defendant experienced auditory hallucinations causing him to become increasingly paranoid. Dr. Deland stated that as a result of his paranoia defendant began to carry a gun, and when he saw the victim in the mall, everything came together. Dr. Deland testified she was aware of a prior incident between defendant and the victim and opined that the prior encounter during which the victim fired a gun in defendant's direction approximately ten years prior to the victim's murder, might have led defendant to attribute the victim to his delusion regarding an organized conspiracy against him.
Conversely, the State's expert psychiatrist, Dr. Richoux, and forensic psychologist, Dr. Salcedo, were of the opinion that defendant's psychiatric disorder did not impair his ability to distinguish right from wrong at the time of the offense. Dr. Richoux testified that during his initial encounters with defendant shortly after his arrest, no psychotic symptoms were present. However, after a meeting with defendant in December of 2015, defendant appeared to Dr. Richoux to be suffering from schizophrenia. After treatment at a mental health hospital, Dr. Richoux was of the opinion that defendant achieved competency and was not manifesting any psychotic symptoms. Per the State's request, Dr. Richoux also evaluated defendant's sanity at the time of the offense. In his medical opinion, Dr. Richoux conceded that while defendant suffers from a psychiatric disorder, whether schizophrenia or a delusional disorder, he was able to distinguish between right and wrong at the time of the offense.
Dr. Richoux was of the opinion that just because a person's actions are motivated by psychotic thoughts does not mean they have the inability to distinguish right from wrong. He explained that defendant's behavior on the day of the shooting does not comport with the actions of a person who became increasingly paranoid in the weeks leading up the shooting. He noted that despite his paranoia, defendant elected to go shopping at the mall on Christmas Eve, one of the busiest shopping days of the year, and then is seen on surveillance cameras standing in front of Foot Locker for four minutes before acting as the aggressor by entering the store and shooting the *818 victim. It was his opinion that defendant's actions following the shooting, including his attempt to blend in with the panicked crowd, flight from the police, and disposal of the murder weapon, all aided in his opinion regarding his sanity at the time of the offense.
As touched on by Dr. Richoux, defendant's actions prior to, at the time of, and after the shooting lend further credence to the jury's determination that he was not insane at the time of the offense. Video surveillance at the mall depicts defendant standing in front of Foot Locker for approximately four minutes prior to entering the store and firing two shots, one into the victim's back, who had just made a return at the cashier's counter, and two into the victim's face who was already lying on the ground, before fleeing by attempting to blend in with the mall crowd. Further, Dr. Deland conceded the video surveillance showed defendant put on the hood of his sweatshirt prior to the shooting, possibly to conceal his identity.
The evidence at trial further established that defendant then attempted to evade capture by exiting the mall and fleeing through a nearby neighborhood where he discarded his firearm, despite Dr. Deland's theory that defendant fled because he believed other people were out to get him. Defendant also discarded his hooded sweatshirt and cell phone. Such actions aid in the conclusion that defendant knew legal consequences stemmed from his actions. See State v. Jones , 12-750 (La. App. 5 Cir. 5/16/13), 119 So.3d 250, 257 n.8 (finding a defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience); State v. Pettaway , 450 So.2d 1345, 1354 (La. App. 2nd Cir. 1984), writ denied , 456 So.2d 171 (La. 1984) (where expert psychiatrist stated the actions of the defendant, a diagnosed paranoid schizophrenic, immediately after the crime in running and disposing of the weapon were good indications he knew what he did was wrong.)
Further, the victim's mother testified her son and defendant did not get along, testimony which was substantiated by a recorded jail phone call made by defendant following his arrest. During that call defendant was asked if the victim threatened him and he responded, "I don't know, it was like some old s***." Other recorded jail communications evidence defendant's desire to escape culpability where discussions were held concerning the lack of evidence by the State regarding the eyewitness's ability to identify defendant as the perpetrator of the crime.
The jury, faced with the conflicting psychiatric evidence, obviously rejected the opinion of Dr. Deland and believed Drs. Salcedo and Richoux that defendant was capable of distinguishing between right and wrong at the time of the offense, despite the presence of a psychiatric disorder. If there is conflicting evidence on the issue of insanity, the reviewing court should accord great weight to the jury's resolution of the conflicting evidence, provided the jury was properly instructed and no evidence was prejudicially admitted or excluded. Pettaway , supra. The jury's decision should not be overturned unless no rational juror could have found the defendant failed to prove his insanity at the time of the offense. State v. Sharp , 418 So.2d 1344, 1348 (La. 1982) ; State v. Moore , 568 So.2d 612, 618 (La. App. 4th Cir. 1990).
Despite the conflicting expert testimony presented, we find the record supports the determination made by the jury. See State v. Milton , 13-672 (La. App. 5 Cir. 5/14/14), 142 So.3d 157, where the defendant displayed a functioning ability to distinguish right from wrong based on his subsequent feeling of guilt, prayers for the victim, *819 flight, and disposal of the weapon; Abbott , supra , where this Court found the evidence supported the rejection of the defendant's claim under La. R.S. 14:14 that a schizoaffective disorder prevented him from distinguishing right and wrong because the trial court properly rejected the opinions of the evaluating physicians and gave deference to the treating physician's opinion.
Therefore, viewing the foregoing evidence in a light most favorable to the prosecution, we find that any rational trier of fact could conclude defendant failed to prove by a preponderance of the evidence that he was unable to distinguish between right and wrong at the time of the offense.
In his second assignment of error, defendant argues the trial court imposed his life sentence without comment or consideration of the factors set forth under La. C.Cr.P. art. 894.1. Defendant contends this alleged failure by the trial court to consider the mitigating factors that support a sentence below the statutory minimum renders his sentence constitutionally excessive. Defendant maintains a downward departure from the mandatory minimum sentence was warranted in his case under a Dorthey[11] analysis, because he is a twenty-five-year-old, college-educated man, with no history of violence or criminal record, who was suffering from a mental illness at the time of the shooting, regardless of whether it deprived him of reason, thus establishing exceptional circumstances.
The failure to file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. State v. Hunter , 10-552 (La. App. 5 Cir. 1/11/11), 59 So.3d 1270, 1272. Additionally, when a defendant does not raise the issue of the trial judge's failure to consider pertinent mitigating factors under La. C.Cr.P. art. 894.1 at the trial court level, he is precluded from raising such an issue on appeal. State v. Declouet , 09-1046 (La. App. 5 Cir. 10/12/10), 52 So.3d 89, 105, writ denied , 10-2556 (La. 4/8/11), 61 So.3d 681.
The record reflects that although defendant orally objected to the sentence, he failed to file a motion to reconsider sentence. On appeal, he now contends, despite the imposition of a mandatory life sentence, the trial court should have considered the guidelines set forth under La. C.Cr.P. art. 894.1, along with the circumstances of his case, to determine whether a downward departure was warranted based on his "exceptional" circumstances. By failing to raise these arguments in a motion to reconsider sentence, defendant is limited to a bare review of his sentence for constitutional excessiveness.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith , 01-2574 (La. 1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson , 04-334 (La. App. 5 Cir. 9/28/04), 885 So.2d 618, 622, writ denied , 05-0244 (La. 12/9/05), 916 So.2d 1048. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.
*820 State v. Pearson , 07-332 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 656.
The penalty for second degree murder is life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. La. R.S. 14.30.1. A mandatory minimum sentence is presumed constitutional. State v. Royal , 03-439 (La. App. 5 Cir. 9/30/03), 857 So.2d 1167, 1174, writ denied , 03-3172 (La. 3/19/04), 869 So.2d 849. Further, Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. State v. Graham , 422 So.2d 123 (La. 1982) ; State v. Lovick , 00-1833 (La. App. 5 Cir. 5/16/01), 788 So.2d 565, 573, writ denied , 01-1836 (La. 5/10/02), 815 So.2d 833.
In Dorthey , supra , the Louisiana Supreme Court recognized that a mandatory minimum sentence under the Habitual Offender Law may still be reviewed for constitutional excessiveness. In State v. Johnson , 97-1906 (La. 3/4/98), 709 So.2d 672, 676, the Louisiana Supreme Court reexamined Dorthey and outlined the criteria a defendant must meet in order to show that a mandatory minimum sentence under the Habitual Offender Law is constitutionally excessive. Although Dorthey involved a mandatory enhanced sentence, this Court has applied the principles set out in Dorthey to the review of mandatory life sentences other than those imposed under the Habitual Offender Law. See State v. Temple , 01-655 (La. App. 5 Cir. 12/12/01), 806 So.2d 697, 707, writ denied , 02-234 (La. 1/31/03), 836 So.2d 58.
In order to rebut the presumption that a mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that he is "exceptional, which ... means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case." Johnson , 709 So.2d at 676. A sentencing court should exercise its authority to declare excessive a mandatory minimum sentence only under rare circumstances. State v. Lindsey , 99-3256 c/w 99-3302 (La. 10/17/00), 770 So.2d 339, 345.
Defendant fails to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of the mandatory sentence. Defendant did not offer any evidence at sentencing or present argument to rebut the presumption that the mandatory sentence is constitutional. Defendant does not cite a single case where a mandatory life sentence imposed on a defendant convicted of second degree murder was found to be unconstitutionally excessive on appellate review, nor does he present any convincing evidence to support a downward departure from the mandatory minimum life sentence. Accordingly, considering the totality of the facts and circumstances of this case, the record does not support the conclusion that the sentence makes no measurable contribution to acceptable goals of punishment.
ERRORS PATENT DISCUSSION
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reveals one error patent in the Uniform Commitment Order ("UCO"), which must be corrected by the trial court.
A discrepancy exists between the UCO and the minutes and the transcript. Here, defendant was sentenced to a term of life imprisonment at hard labor without the benefit of probation, parole or suspension *821 of sentence; however, the UCO does not reflect the term of imprisonment imposed. Specifically, the UCO indicates the "total sentence" and "imposed time" as "0 yr/ 0 m/ 0d." Accordingly, we remand this matter and hereby order the district court to correct the noted discrepancy in the UCO regarding the sentence imposed by the trial court. We also direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department.
DECREE
For the foregoing reasons, this Court affirms defendant's conviction and sentence. We remand this matter for correction of the Uniform Commitment Order in accordance with the instructions set forth in the opinion.
CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR CORRECTION OF THE UCO

Law enforcement obtained video surveillance within the Foot Locker, food court, and Forever XXI, which captured defendant on tape.

Defendant's sister, Tiara Francois, corroborated their mother's account that defendant talked about hearing voices.

Defendant was not able to obtain copies of medical records regarding this treatment from West Jefferson Mental Health.

Tiara also testified that she received a similar phone call from defendant.

Carletta confirmed this encounter with defendant and the paranoia he exhibited by asking who he could trust.

On cross-examination, Dr. Deland testified that not everyone who is diagnosed with schizophrenia is unable to distinguish right from wrong.

State v. Bennett , 345 So.2d 1129 (La. 1977).

Dr. Salcedo was accepted as an expert in the field of forensic psychology.

Dr. Salcedo concurred with Dr. Richoux's medical opinion. Dr. Salcedo noted that in order for a person to be found legally insane, that person must be seriously psychiatrically impaired, which Dr. Salcedo did not believe applied in defendant's case given his high functioning abilities combined with the facts surrounding the shooting.

Dr. Deland testified that she did not review the video of the shooting.

State v. Dorthey , 623 So.2d 1276 (La. 1993).